14 CV 8672

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| AHLIJAH BRYANT, DONTAY CLARK, MICHAEL DAVILA, RUBEN HAMILTON, QUANDELL HICKMAN, DEVANTE JAMES, RUDOLPH KAVAL, SHYMIL MCBEE-MILES, ELIJAH SELMAN, and JAMON SUTTON, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CITY OF NEW YORK, COMMISSIONER JOSEPH PONTE, COMMISSIONER MARK J. CRANSTON, COMMISSIONER DORA B. SCHRIRO, CHIEF OF DEPARTMENT WILLIAM P. CLEMONS, CHIEF OF DEPARTMENT EVELYN A. MIRABAL, and CHIEF OF DEPARTMENT MICHAEL HOURIHANE, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

14 Civ. _____

COMPLAINT

JURY DEMAND

## INTRODUCTION

1.     The City of New York ("City") holds thousands of people in detention facilities each day.  The vast majority are pretrial detainees who cannot make bail and are held at Rikers Island merely to ensure their presence at trial.  They are subject to the restrictions and conditions of the detention facility, but such restrictions and conditions must not violate the Constitution.  In particular, pretrial detainees may not be punished until the government has secured a formal adjudication of guilt in accordance with due process of law.  In addition, pretrial detainees may not be deprived of their liberty without adequate process.

2.     This case challenges Defendants' policy and practice of confining pretrial

detainees in solitary confinement, without notice or a hearing, to punish detainees for conduct that occurred during a previous detention.  Plaintiffs Ahlijah Bryant, Quandell Hickman, Shymil McBee-Miles, and Elijah Selman sue on behalf of themselves and a class of similarly situated individuals, and Plaintiffs Dontay Clark, Michael Davila, Ruben Hamilton, Devante James, Rudolph Kaval, and Jamon Sutton sue on behalf of themselves.

3.     Solitary confinement is a dangerous practice, designed to cause severe pain and suffering.  Defendants are well aware of the devastating effects solitary confinement has on detainees.  In solitary confinement, adults and adolescents languish alone in extreme isolation for at least 23 hours per day, 7 days per week.  They are housed in cramped, single-occupancy cells that deny them meaningful physical movement and the normal human interactions necessary for a person's well-being.  As the City's Department of Health and Mental Hygiene has explained, "it is expected that healthy persons when placed in solitary confinement will suffer harm."  Indeed, a recent report commissioned by the New York City Board of Correction found that solitary confinement "is one of the most severe forms of punishment that can be inflicted on human beings short of killing them."

4.     In City facilities, solitary confinement is known as Punitive Segregation.  Defendants have a written policy that authorizes City employees to place and keep pretrial detainees in Punitive Segregation to serve the balance of Punitive Segregation days incurred during a prior detention ("Old Time").  This policy, Directive 6500R-B, states in relevant part:

> If an inmate is released on bail or on his/her own recognizance, is discharged, or is transferred to the custody of another jurisdiction or agency before he/she finishes serving his/her Punitive Segregation sentence . . ., the transfer will interrupt the sentence being served and the interruption will continue until the inmate returns to the jurisdiction of the Department, at which time he/she may be required to serve the balance owed . . . .

2

5. For pretrial detainees who are charged with an infraction, Defendants follow a disciplinary process to determine whether and for how long to place detainees in Punitive Segregation. Defendants provide such detainees with a hearing, advance written notice of such hearing, the opportunity to defend themselves, including the opportunity to establish facts concerning what, if any, penalty is appropriate during that detention, and a written statement by a fact-finder.

6. In contrast, pretrial detainees who are released and then return to City custody with Old Time receive none of these protections before they are placed in Punitive Segregation to serve Old Time. Defendants' policy, Directive 6500R-B, authorizes City employees to place and keep pretrial detainees in Punitive Segregation to serve Old Time without any process, much less adequate process, on the ground that such Old Time is a "sentence" that was "interrupt[ed]," and for which process is not due. This policy, as implemented by Defendants, deprives pretrial detainees of liberty without due process, in violation of their procedural due process rights.

7. Defendants' Old Time policy and practice also violates substantive due process by punishing pretrial detainees before the government has secured a formal adjudication of guilt in accordance with due process of law. The purported justification for confining a pretrial detainee in Punitive Segregation for an infraction committed during a detention is that the detainee's placement in Punitive Segregation is necessary to maintain safety and order in the detention facility. However, that justification is wholly attenuated for a pretrial detainee who once committed an infraction, is released from jail, and later returns to City custody with Old Time, months or even years later. This policy, as implemented by Defendants, punishes pretrial detainees for conduct from a previous detention, even if far removed in time and circumstance. Defendants do not consider whether placing such pretrial detainees in Punitive Segregation is

reasonably related to maintaining security and order in the detention facility. Instead, Defendants rely solely on the mistaken belief that Punitive Segregation is a "sentence" that must be "continue[d]" under Directive 6500R-B. Pursuant to Defendants' policy and practice, the City places detainees in Punitive Segregation to serve Old Time regardless of whether such a detainee currently poses a threat to safety and security in the facility; whether such a detainee is presently or has ever been confined in general population after incurring Old Time; the disposition of any criminal charges for conduct for which such a detainee received Old Time; the disciplinary record of such a detainee relative to that of detainees in the general population; the security risk such a detainee poses relative to detainees in the general population; the passage of time since such a detainee received Punitive Segregation days; the passage of time since such a detainee was discharged from City custody; and the availability of adequate alternatives to Punitive Segregation. Defendants' Old Time policy and practice is arbitrary, unrelated to the effective management of safety and security in the facility, and not reasonably related to any legitimate interest in maintaining order in City facilities.

8.      Plaintiffs Bryant, Hickman, McBee-Miles, and Selman sue on their own behalf and as representatives of a class of pretrial detainees who are or will be held in Punitive Segregation in the City's custody to serve Old Time. The class sues for violations of their Fourteenth Amendment right to substantive due process and seeks declaratory and injunctive relief.

9.      Plaintiffs Bryant, Hickman, McBee-Miles, and Selman also sue on their own behalf and as representatives of a subclass of pretrial detainees who did not receive adequate process before being held in Punitive Segregation to serve Old Time. The subclass sues for violations of their Fourteenth Amendment right to procedural due process and seeks declaratory

4

and injunctive relief.

## JURISDICTION AND VENUE

10.    This action arises under 42 U.S.C. §§ 1983 and 1988 and the Fourteenth Amendment to the United States Constitution.

11.    The jurisdiction of this Court is predicated on 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

12.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in the Southern District of New York.

## JURY DEMAND

13.    Plaintiffs demand trial by jury in this action.

## PARTIES

A.    **Plaintiffs**

14.    Plaintiffs Ahlijah Bryant, Quandell Hickman, Shymil McBee-Miles, and Elijah Selman are presently detained at City detention facilities.  Plaintiffs Dontay Clark, Michael Davila, Ruben Hamilton, Devante James, Rudolph Kaval, and Jamon Sutton have been confined in Punitive Segregation at City detention facilities, without adequate process, to serve Old Time.

A.    **Defendants**

15.    Defendant City is a municipal corporation, which, through its Department of Correction ("DOC"), operates a number of detention facilities for pretrial detainees.  The City and senior officials at the central DOC office, in each DOC facility, and in specialized DOC units, promulgate and implement policies, including those with respect to the confinement of pretrial detainees in Punitive Segregation.  The City is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the Defendants referenced

herein.

16.     Since April 2014, Defendant Joseph Ponte has been and is Commissioner of DOC, acting in the capacity of agent, servant, and employee of the City, within the scope of his employment as such, and acting under color of state law. As Commissioner, he has been and is the chief executive officer of DOC, responsible for the management and control of all DOC facilities, the care, custody, and control of pretrial detainees in DOC facilities, and the policies concerning confinement of pretrial detainees in Punitive Segregation in DOC facilities. Defendant Ponte is sued in his official capacity for injunctive and declaratory relief and in his individual capacity for monetary relief.

17.     From January 2014 to April 2014, Defendant Mark J. Cranston was Commissioner of DOC, acting in the capacity of agent, servant, and employee of the City, within the scope of his employment as such, and acting under color of state law. As Commissioner, he was the chief executive officer of DOC, responsible for the management and control of all DOC facilities, the care, custody, and control of pretrial detainees in DOC facilities, and the policies concerning confinement of pretrial detainees in Punitive Segregation in DOC facilities. Defendant Cranston is sued in his individual capacity for monetary relief.

18.     From September 2009 to January 2014, Dora B. Schriro was Commissioner of DOC, acting in the capacity of agent, servant, and employee of the City, within the scope of her employment as such, and acting under color of state law. As Commissioner, she was the chief executive officer of DOC, responsible for the management and control of all DOC facilities, the care, custody, and control of pretrial detainees in DOC facilities, and the policies concerning confinement of pretrial detainees in Punitive Segregation in DOC facilities. Defendant Schriro is sued in her individual capacity for monetary relief.

19.     Since May 2014, William P. Clemons has been and is Chief of Department of DOC, acting in the capacity of agent, servant, and employee of the City, within the scope of his employment as such, and acting under color of state law. As Chief of Department, he is the highest-ranking uniformed member of DOC and has been and is responsible for the supervision, oversight, and discipline of the uniformed staff in all DOC facilities, the care, custody, and control of pretrial detainees in DOC facilities, and the policies concerning confinement of pretrial detainees in Punitive Segregation in DOC facilities. Defendant Clemons is sued in his official capacity for injunctive and declaratory relief and in his individual capacity for monetary relief.

20.     From December 2012 to May 2014, Evelyn A. Mirabal was Chief of Department of DOC, acting in the capacity of agent, servant, and employee of the City, within the scope of her employment as such, and acting under color of state law. As Chief of Department, she was the highest-ranking uniformed member of DOC and was responsible for the supervision, oversight, and discipline of the uniformed staff in all DOC facilities, the care, custody, and control of pretrial detainees in DOC facilities, and the policies concerning confinement of pretrial detainees in Punitive Segregation in DOC facilities. Defendant Mirabal is sued in her individual capacity for monetary relief.

21.     From August 2011 to December 2012, Michael Hourihane was Chief of Department of DOC, acting in the capacity of agent, servant, and employee of the City, within the scope of his employment as such, and acting under color of state law. As Chief of Department, he was the highest-ranking uniformed member of DOC and was responsible for the supervision, oversight, and discipline of the uniformed staff in all DOC facilities, the care, custody, and control of pretrial detainees in DOC facilities, and the policies concerning

7

confinement of pretrial detainees in Punitive Segregation in DOC facilities.  Defendant

Hourihane is sued in his individual capacity for monetary relief.

22.     Defendants Ponte, Cranston, Schriro, Clemons, Mirabal, and Hourihane are

collectively referred to as "Individual Defendants."

## STATEMENT OF FACTS

### A.    Solitary Confinement in City Facilities

23.     The City operates ten jails, four houses of detention, court pens in each of the five

boroughs, and two hospital prison wards. *See* City of New York, *Mayor's Management Report:*

*Fiscal 2014*, at 51 (2014), *available at* http://www.nyc.gov/html/ops/downloads/pdf/mmr2014

/2014_mmr.pdf.

24.     In the past year, City facilities have held over 80,000 inmates, with an average

daily population of over 10,000, and an average length of stay of about 50 days.  The large

majority of inmates held in City facilities are pretrial detainees, awaiting trial because they

cannot pay bail.

25.     Punitive Segregation is the City's version of solitary confinement and extreme

isolation.  In Punitive Segregation, pretrial detainees are confined to a single-occupancy cell for

at least 23 hours per day, 7 days per week, socially isolating them from others.  Their cells are

small and cramped, about 8' by 10', denying them a meaningful opportunity for physical

movement.  The cells often contain bugs and vermin and are very hot in the summer and very

cold in the winter.

26.     In Punitive Segregation, pretrial detainees receive their food through a slot in their

cell's steel door.  They must eat all meals alone and they cannot purchase food from the

commissary.  Their food is often cold and stale and sometimes spoiled and moldy.

27.    Pretrial detainees in Punitive Segregation cannot have a normal human conversation with another inmate.  They cannot communicate with other inmates unless they scream through their cell's steel doors.  But correction officers can punish such communication as a rule violation, resulting in more time in Punitive Segregation.

28.    In Punitive Segregation, contact with family and friends is severely restricted. Pretrial detainees in general population are allowed one personal phone call per day, but detainees in Punitive Segregation are allowed only one personal phone call per week, for a maximum of six minutes.

29.    Pretrial detainees in Punitive Segregation are prohibited from work assignments and rarely, if ever, have access to programming or vocational activities.  They are supposed to receive one hour of "recreation" per day, in which they are transferred in shackles to small, barren cages.  However, about 90% of the time they are denied even this single hour outside their cell.  *See* NYC Board of Correction, *Barriers to Recreation at Rikers Island's Central Punitive Segregation Unit*, at 9 (July 2014), *available at* http://www.nyc.gov/html/boc/downloads/pdf /reports/CPSU_Rec_Report.pdf.

30.    In Punitive Segregation, pretrial detainees have limited access to appropriate and timely health care.  Mental health care often is superficial and conducted with the inmate locked in the cell and told to yell through the door to the clinician outside.  Some mentally ill detainees are placed in Restrictive Housing Units ("RHU"), which the City admits are "punitive segregation beds for infracted inmates with mental illness."  Attachment to NYC Board of Correction, Minutes for July 22, 2013 Public Meeting (2013), *available at* http://www.nyc.gov /html/boc/downloads/pdf/Minutes/BOCMinutes%20_20130722.pdf; *see also* City of New York, *Mayor's Management Report: September 2013*, at 21 (2013), *available at* http://www.nyc.gov

/html/ops/downloads/pdf/mmr2013/doc.pdf (describing RHU as "the place where the penalty of punitive segregation is imposed").

31.    Empirical research over the last several decades has produced a massive body of data on the severe trauma that solitary confinement inflicts on inmates, even after short periods of confinement. *See, e.g.*, Peter S. Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUSTICE 441 (2006); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325 (2006).   In brief, physiological and neurological harms include headaches, dizziness, heart palpitations, increased pulse, loss of appetite, and digestive failures.  Many inmates become hypersensitive to any stimuli, including noise and light.  Inmates in solitary confinement cannot focus or concentrate for extended periods of time.  Solitary confinement also results in depression, anxiety, and suicidal ideation.  Solitary confinement of pretrial detainees, during a period of overwhelming uncertainty, is especially harmful; during this period, detainees are more likely to suffer depression and commit suicide and acts of self-harm.  Moreover, solitary confinement before trial greatly impairs detainees' ability to assist in their own defense.  The effects of solitary confinement do not end when a detainee is released; after release from solitary confinement, inmates experience great anxiety when confronted by social situations and are less able to function productively in their community and more likely to engage in violence and return to jail.

32.    Because Punitive Segregation distorts people's perceptions of reality and impairs their thinking, concentration, decision-making, and self-control, inmates often incur additional infractions while in Punitive Segregation and then are required to serve even more days in Punitive Segregation.  It is not uncommon for inmates to owe hundreds of days in Punitive

Segregation.  For example, at a Board of Correction meeting on March 11, 2014, a Board

member described his tour of a Punitive Segregation unit on Rikers Island, where the detainees

had "an average of 373 days in solitary confinement, and two persons out of the nine owed over

2,000 days in punitive segregation." NYC Board of Correction, Minutes for March 11, 2014

Public Meeting, at 7 (2014), *available at* http://www.nyc.gov/html/boc/downloads/pdf/Minutes

/BOCMinutes_20140311.pdf; *see also* Three Adolescents Report at 1, 9, 16 (describing three

inmates who each were sentenced to over 200 days in Punitive Segregation).

**B.    Placement in Punitive Segregation**

33.    Directive 6500R-B, signed by DOC Chief of Department and DOC

Commissioner, establishes a procedure for inmate disciplinary infractions.  DOC, Directive

6500R-B:  Inmate Disciplinary Due Process, *available at* http://www.nyc.gov/html/doc

/downloads/pdf/6500R-B.pdf.   The Directive states that when detainees are issued an infraction,

they must receive, among other things, advanced written notice of the charges at least 24 hours

before a hearing; the opportunity to appear at a hearing, to call witnesses, and to present rebuttal

evidence; and a written statement by the fact-finder.

34.    Pursuant to DOC's Directive, disciplinary hearings are held to allow the

adjudicator to "weigh the evidence presented at the hearing and reach a decision" as to the

inmate's guilt or innocence and "the appropriate disposition or penalty, if any, to be imposed."

Directive 6500R-B, § III.C.33.  The Directive provides for a variety of penalties, including

reprimand, loss of privileges, loss of good time, restitution, and Punitive Segregation.

**C.    Punitive Segregation Based on Old Time**

35.    For pretrial detainees who leave the City's custody with a balance of Punitive

Segregation time, Directive 6500R-B, § III.D.5. provides that:

> If an inmate is released on bail or on his/her own recognizance, is discharged, or is transferred to the custody of another jurisdiction or agency before he/she finishes serving his/her Punitive Segregation sentence, and/or before he/she makes restitution in accordance with a penalty imposed as a result of a disciplinary hearing, the transfer will interrupt the sentence being served and the interruption will continue until the inmate returns to the jurisdiction of the Department, at which time he/she may be required to serve the balance owed and/or finish making restitution.

36.     Directive 6500R-B authorizes City employees to place and keep pretrial detainees in Punitive Segregation to serve Old Time, which is the balance of Punitive Segregation days incurred during a prior detention.  Pretrial detainees are confined in Punitive Segregation to serve Old Time when DOC recognizes that the pretrial detainee has Old Time and when Punitive Segregation cells are available.

37.     Restrictions may not be imposed on pretrial detainees for the purpose of punishment or without connection to a legitimate governmental objective.  The purported justification for confining a pretrial detainee in Punitive Segregation for an infraction committed during a detention is to maintain safety and order in the detention facility.  However, that justification is wholly attenuated for a pretrial detainee who once committed an infraction, is released from jail, and later returns to City custody with Old Time, months or even years later. Defendants do not consider whether placing such pretrial detainees in Punitive Segregation is reasonably related to maintaining security and order in the detention facility.  Instead, pursuant to Defendants' policy and practice, DOC fails to evaluate the reasonableness of confining such detainees in Punitive Segregation or the availability of adequate alternatives in light of the detainees' present circumstances.  DOC places detainees in Punitive Segregation to serve Old Time regardless of whether such a detainee currently poses a threat to safety and security in the facility; whether such a detainee is presently or has ever been confined in general population

after incurring Old Time; the disposition of any criminal charges for conduct for which such a

detainee received Old Time; the disciplinary record of such a detainee relative to that of

detainees in the general population; the security risk such a detainee poses relative to detainees in

the general population; the passage of time since such a detainee received Punitive Segregation

days; the passage of time since such a detainee was discharged from DOC custody; and the

availability of adequate alternatives to Punitive Segregation. Defendants' policy and practice of

placing detainees in Punitive Segregation to serve Old Time is arbitrary, unrelated to the

effective management of safety and security in the facility, and not reasonably related to any

legitimate interest in maintaining order in DOC facilities.

38.    Pursuant to Defendants' policy and practice, pretrial detainees are held in Punitive

Segregation to serve Old Time specifically for the purpose of punishment and in direct

contravention of their right to be free from punishment before the government has secured a

formal adjudication of guilt in accordance with due process of law. Directive 6500R-B is

explicit: the discipline is a "punitive" "sentence" imposed because a correction official found the

inmate "guilty" of an infraction during a prior detention. *See also* Directive 4020R-A

(describing Punitive Segregation as "a specific sentence of confinement" involving "twenty-three

(23) hour lock-down" imposed on inmates "charged with, and found guilty of, committing a

violation of Department rules"). In Punitive Segregation, pretrial detainees are confined to a

small, cramped cell for 23 hours per day, which is an affirmative disability or restraint on their

liberty. Punitive Segregation has been historically regarded as punishment, and many infractions

that result in Old Time are duplicative of criminal laws. Moreover, Defendants use Punitive

Segregation to promote retribution and deterrence, by calibrating the number of days in Punitive

Segregation for each infraction as if the pretrial detainee had been convicted of a crime, and by

13

treating Old Time like a sentence imposed after a jury trial on a criminal charge. Such confinement of pretrial detainees in Punitive Segregation to serve Old Time lacks any rational purpose other than punishment, and even if there were such a purpose, such confinement in Punitive Segregation is excessive in relation to such alternative purpose and not reasonably related to a legitimate governmental objective.

39.    Pursuant to Defendants' policy and practice, when pretrial detainees are placed in Punitive Segregation to serve Old Time, Defendants have refused and continue to refuse to provide the following:  the opportunity to appear at a hearing concerning the appropriate disposition or penalty under the circumstances; advanced written notice of such a hearing; the opportunity to call witnesses and present rebuttal evidence; and a written statement by the fact-finder as to the evidence relied on and the reason for the action (collectively, "Adequate Process"), in violation of the Fourteenth Amendment's procedural due process protections. Under Directive 6500R-B, Defendants consider the placement of a pretrial detainee in Punitive Segregation to serve Old Time to be an "interrupt[ion]" of a "sentence," for which they do not need to provide pretrial detainees with Adequate Process.

40.    Pretrial detainees have a liberty interest in avoiding Old Time, arising both from the Fourteenth Amendment itself, by reason of guarantees implicit in the word "liberty," and from an expectation or interest created by state and city laws or policies, including Title 39, Chapter 1 of the Rules of the City of New York and Directive 6500R-B. Given such a liberty interest, Defendants are required to provide all pretrial detainees with Adequate Process, which they fail to do before placing pretrial detainees in Punitive Segregation to serve Old Time.

**D.    Plaintiffs' Confinement in Punitive Segregation to Serve Old Time**

41.    Plaintiff Ahlijah Bryant was detained at Rikers Island in February 2012 as a

14

pretrial detainee.  During this detention, he received hundreds of days in Punitive Segregation and served approximately five months in Punitive Segregation.  Bryant was released from City custody in April 2013.  On or about January 15, 2014, Bryant was arrested on new charges and detained in City custody.  On or about January 26, 2014, Bryant was placed in Punitive Segregation at the Otis Bantum Correctional Center ("OBCC") to serve his Old Time.

42.      Bryant did not receive advance written notice, a hearing, the opportunity to defend himself, the opportunity to establish facts concerning what an appropriate disposition or penalty should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to serve Old Time.  This placement in Punitive Segregation to serve Old Time without Adequate Process was authorized by City policy and practice that Defendants Ponte, Cranston, Schriro, Clemons, and Mirabal condoned.  Bryant remains in Punitive Segregation.

43.      In Punitive Segregation, Bryant is confined to his cell twenty-three hours per day except for an occasional hour of recreation.  He is isolated and allowed almost no social interaction with others.  DOC fails to provide him with legal phone calls, and for about one month he was denied telephone access entirely.  DOC also fails to provide him with basic human necessities such as regular access to showers, nourishing food, and meaningful medical treatment.  He suffers from allergies and has a chronic pain in his side, both of which have been left untreated despite Bryant's requests to see medical staff.  Bryant has been diagnosed with Attention Deficit Hyperactive Disorder ("ADHD").  Bryant is not provided with any meaningful mental health treatment for his condition.  As a result of his extreme isolation, Bryant has become despondent, agitated, and depressed.  Sometimes Bryant feels like he is going crazy in Punitive Segregation and sometimes he talks to himself because he is so isolated.

44.      Dontay Clark was detained at Rikers Island in December 2011 as a pretrial

15

detainee. While there, he received eighty-one Punitive Segregation days. He did not serve any of those days during his detention and was released from City custody in July 2012. In January 2014, one year and a half after his release from City custody, Clark returned to Rikers Island as a pretrial detainee. While there, he received an infraction, which was dismissed after a hearing. After the infraction was dismissed, a DOC correction officer told him that he owed eighty-one Punitive Segregation days from the two infractions he received in 2012. On or about February 21, 2014, after having spent about one month in the general population, Clark was placed into Punitive Segregation to serve Old Time. Clark served about eighty-one days in Punitive Segregation on Old Time.

45.    In Punitive Segregation, Clark was confined alone to his cell for twenty-three and sometimes twenty-four hours per day. Clark was denied access to regular recreation. For the first two months that he was housed in the Punitive Segregation unit at OBCC, Clark left his cell only once for recreation. Clark's cell was small, cold, and dirty and there were bugs and roaches. The bed was flat and hurt his back, and DOC provided clean linens to Clark only about once every three weeks. Clark lost weight because the food portions were small, cold, and unhealthy. Clark received no programs or religious services. Punitive Segregation made Clark feel crazy and he regularly had thoughts of suicide and hurting himself.

46.    Clark did not receive advance written notice, a hearing, the opportunity to defend himself, the opportunity to establish facts concerning what an appropriate disposition or penalty should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to serve Old Time. This placement without Adequate Process in Punitive Segregation to serve Old Time was authorized by City policy and practice that Defendants Ponte, Cranston, and Mirabal condoned.

16

47.    Plaintiff Michael Davila was detained at Rikers Island in 2012 as a pretrial detainee. During this detention, Davila received infractions that totaled about ninety days in Punitive Segregation and served about seventeen of those days before he was released from City custody. During a subsequent detention at Rikers Island in 2013, Davila received fifteen days of Punitive Segregation, which he did not serve before his release on or about August 23, 2013. Nine months later, on or about April 25, 2014, Davila was arrested on new charges and detained in City custody. On or about May 13, 2014, City correction officers informed Davila that he had eighty-eight days of Old Time and that he was being sent to Punitive Segregation to serve that time because he "still owed DOC." That day, Davila was sent to Punitive Segregation in OBCC. Davila served about eighty-eight days in Punitive Segregation on Old Time.

48.    While in Punitive Segregation, Davila was confined to a small cell for twenty-three hours per day. Upon commitment to City custody, Davila learned that he suffered from a serious medical illness that requires intensive treatment. In general population, he received medical care for his illness, but when he was sent to segregation to serve his Old Time, DOC denied him regular and meaningful access to medical care. In Punitive Segregation, Davila became depressed and was diagnosed with a mental illness for which he was prescribed medication. Despite this, DOC kept Davila confined in Punitive Segregation to serve Old Time.

49.    Davila did not receive advance written notice, a hearing, the opportunity to defend himself, the opportunity to establish facts concerning what an appropriate disposition or penalty should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to serve Old Time. This placement without Adequate Process in Punitive Segregation to serve Old Time was authorized by City policy and practice that Defendants Ponte, Clemons, and Mirabal condoned.

17

50.     Plaintiff Ruben Hamilton was detained at Rikers Island in 2013 as a pretrial detainee. During this detention, Hamilton received eighty-one days in Punitive Segregation. Hamilton was not placed in Punitive Segregation, however, and months later, on or about February 11, 2014, he was released from City custody before serving any of the days in Punitive Segregation. On or about July 2014, Hamilton returned to City custody as a pretrial detainee. A few days after arriving, he was sent to Punitive Segregation to serve Old Time from 2013. Hamilton spent about twenty days in Punitive Segregation in OBCC serving Old Time, before being returned to the general population.

51.     In Punitive Segregation, Hamilton was confined in isolation to a small cell twenty-four hours per day. He rarely left his cell except for showers. His cell was dirty and filled with bugs and flying gnats. Hamilton has been diagnosed with schizophrenia and he has been hospitalized in the past for his condition.   During his confinement in Punitive Segregation, his mental health deteriorated and his schizophrenia symptoms worsened. Hamilton became sad, depressed and felt isolated. His short-term memory became distorted; although Hamilton could remember things that happened in the distant past, while held in Punitive Segregation he could not remember the preceding few days. Sometimes Hamilton suffered from hallucinations and talked to himself because he was socially isolated.

52.     Hamilton did not receive advance written notice, a hearing, the opportunity to defend himself, the opportunity to establish facts concerning what an appropriate disposition or penalty should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to serve Old Time. He served approximately twenty days of Old Time before being placed back in general population. This placement without Adequate Process in Punitive Segregation to serve Old Time was authorized by City policy and practice that Defendants Ponte

and Clemons condoned.

53.     Plaintiff Quandell Hickman was detained at Rikers Island in May 2012 as a

pretrial detainee.  During this detention, Hickman received three hundred and twenty-five days in

Punitive Segregation for an incident in which he also was criminally charged with disorderly

conduct.  Hickman pleaded guilty to the criminal charge and was sentenced to fifteen days in jail.

He served his criminal sentence and was released from Rikers Island on January 17, 2013, before

he had completed his Punitive Segregation days.

54.     On or about August 7, 2013, Hickman was committed to DOC custody at the

Manhattan Detention Complex where he initially was housed in general population.  After about

one week, Hickman was sent to Punitive Segregation at OBCC to serve the Old Time from 2012.

In November 2013, Hickman attempted suicide after becoming depressed because of his

isolation.  Hickman was removed from Punitive Segregation and placed on suicide watch in a

mental observation unit until he was released on bail from City custody on or about November

20, 2013.

55.     In July 2014, Hickman again was returned to City custody.  On or about July 10,

2014, Hickman was told by security correction officers to "pack up" because he was being

returned to Punitive Segregation at OBCC to serve his one hundred and ninety-nine days of Old

Time from 2012.  Hickman remains in Punitive Segregation today.

56.     In 2013 and 2014, Hickman did not receive advance written notice, a hearing, the

opportunity to defend himself, the opportunity to establish facts concerning what an appropriate

disposition or penalty should be, or a written statement by a fact-finder before he was placed in

Punitive Segregation to serve Old Time.  These placements without Adequate Process in

Punitive Segregation to serve Old Time were authorized by City policy and practice, and

19

condoned by Defendants Schriro and Mirabal in 2013 and by Defendants Ponte and Clemons in 2014. Hickman remains in Punitive Segregation on Old Time.

57.    In Punitive Segregation, Hickman is confined to a cell twenty-three hours per day. Hickman is isolated and is allowed almost no social interaction with others. He was denied recreation entirely for the first thirty days he was housed there. He sleeps on a concrete slab with a thin mattress. His cell is filthy and infested with cockroaches and water bugs. During the summer months his cell is oppressively hot, sometimes reaching well over one hundred degrees. Hickman eats alone in his cell and is served meals through a food slot in his steel cell door. There is barely enough food served and Hickman has lost weight due to his poor diet. The food that is served is often spoiled and he is served warm milk. Hickman is denied basic hygiene items like soap and toothpaste. Hickman also is denied Christian religious services.

58.    As a result of his confinement, Hickman has become despondent, anxious, depressed, and sometimes feels suicidal. He also is in constant physical pain. His left leg was broken in several places from getting hit by a car, and he has a cast on his left foot from a different injury. Hickman has a metal rod in his leg and cannot walk without the use of crutches. DOC has failed to provide Hickman with proper medical treatment. When Hickman is confined to his cell the correction officers take away his crutches, and he is forced to attempt to hop on his right foot to get around his cell. Consequently, he has fallen and injured himself while in his cell.

59.    Plaintiff Devante James was detained at Rikers Island in December 2012 as a pretrial detainee. During this detention, he initially was placed in a mental health housing area for adolescents at the George R. Vierno Center ("GRVC"). While there, he received about one hundred and seventy days in Punitive Segregation. James was released on bail in March 2013,

before he completed the one hundred and seventy days of time in segregation. In April 2013, James returned to DOC custody and was placed with other adolescents at the Robert N. Davoren Complex ("RNDC"). At that time, he received another infraction and was given thirty days in Punitive Segregation. James was released from DOC custody in May 2013. James returned to custody almost one year later, in March 2014, and was immediately sent to the Punitive Segregation unit for adolescents at RNDC to complete his Old Time from 2012. In August 2014, he was moved to the Central Punitive Segregation Unit at OBCC, where he remained for over one month.

60.    James is diagnosed with bipolar disorder and has been hospitalized multiple times between 2004 and 2012 for his condition. In Punitive Segregation he was confined to a small, dirty cell twenty-three hours per day where he had no social contact with others. Sometimes DOC denied him even one hour of recreation outside his cell. James ate alone in his cell and the portions were inadequate and sometimes the food was spoiled. He lost fifteen pounds because of the diet DOC provided him in Punitive Segregation. James slept on a concrete bed with a thin mattress that hurt his back. On some occasions DOC failed to provide him with regular showers and he had very limited access to hygienic items. DOC failed to provide him with summer school materials and denied him the opportunity to participate in Catholic religious services.

61.    In the summer months, James's cell was hot and stifling and he had difficulty breathing. James suffers from asthma, but he was not provided with an inhaler or any meaningful medical treatment despite his requests to see medical staff. James also has a heart murmur and suffered from a leg injury, which required physical therapy. To no avail, he asked to see medical staff on many occasions to receive treatment for these conditions. DOC also failed to provide James with any meaningful mental health treatment. From March 2014 to

August 2014, he was not given his regularly prescribed medication for his bipolar disorder. On

the rare occasions when a mental health worker did visit him, the worker spoke with him from

outside his cell door and told him there was nothing wrong with him. James's mental health also

worsened in Punitive Segregation. He became despondent, anxious, and depressed. He often

felt suicidal and cut himself. DOC staff ignored James when he reported his suicidal thoughts or

his desires to harm himself.

62.    James did not receive advance written notice, a hearing, the opportunity to defend

himself, the opportunity to establish facts concerning what an appropriate disposition or penalty

should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to

serve Old Time. This placement without Adequate Process in Punitive Segregation to serve Old

Time was authorized by City policy and practice that Defendants Ponte, Cranston, Clemons, and

Mirabal condoned.

63.    Plaintiff Rudolph Kaval was detained at Rikers Island in August 1997 as a pretrial

detainee. During this detention, he incurred hundreds of Punitive Segregation days. When he

was transferred out of City custody in February 1999, he had not yet served all of his Punitive

Segregation days. In 2010, over a decade after he was transferred out of City custody, Kaval

returned to Rikers Island as a pretrial detainee. He was initially housed in administrative

segregation in the Anna M. Kross Center ("AMKC"). While there, Kaval received an infraction

in early 2011, for which he received Punitive Segregation days. Kaval was released from City

custody in March 2011, before completing all of the Punitive Segregation days he incurred

during that detention. On January 10, 2012, Kaval returned to City custody as a pretrial detainee,

and was placed in general population at the Vernon C. Bain Center ("VCBC"). A few days later,

a DOC Security Captain told Kaval that he owed Punitive Segregation days from previous

detentions in 1998, 1999, and 2011, and Kaval was sent to Punitive Segregation at OBCC to serve Old Time. Kaval did not receive advance written notice, a hearing, the opportunity to defend himself, the opportunity to establish facts concerning what an appropriate disposition or penalty should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to serve Old Time. Kaval's placement without Adequate Process in Punitive Segregation to serve Old Time was authorized by City policy and practice that Defendants Schriro and Hourihane condoned. In July 2012, after about seven and a half months in Punitive Segregation, Kaval was sent back to general population without any explanation.

64.    The seven and half months in Punitive Segregation traumatized Kaval emotionally, psychologically, and physically. While serving Old Time, Kaval was confined in a small cell for twenty-three hours per day, isolated from others. He slept on a thin mattress on top of a stone slate and his cell contained a sink-toilet combination unit. He often woke in the mornings with either water bugs or cockroaches crawling on him or around his cell. In the summer months, his cell was unbearably hot. Kaval ate alone and his meals were served through a slot in the cell's steel door, and the food was often inadequate, moldy, and cold. In Punitive Segregation, Kaval's cell was searched three to five times per week, which involved the correction officers tossing his belongings all over the cell. Kaval was permitted one shower per day in an enclosed area filled with mold, mildew, and bugs.

65.    Kaval had little access to meaningful medical treatment despite repeated requests to DOC staff. Before his 2012 detention, Kaval had spinal fusion surgery, where plates and screws were fused to his spine and he was required to use a cane. The poor sleeping conditions in his Punitive Segregation cell, plus the heavy shackles and waist restraint that he was forced to wear when he left his cell, caused him significant physical pain and additional injuries in his

23

lower back. DOC often denied Kaval access to his medically necessary cane for walking, which caused Kaval additional pain and distress.

66. Kaval had almost no social interaction in Punitive Segregation in 2012. He attempted to but could not speak with other inmates while confined in his Punitive Segregation cell. Kaval sometimes attempted to yell through the steel door to other inmates in the unit for social contact, but he did so infrequently because he was afraid of being charged with additional infractions. As a result, he became severely depressed and anxious, often talking to himself for long periods of time.

67. Kaval was denied access to religious services while in Punitive Segregation in 2012. His access to the law library was significantly curtailed and he was unable to aid in his defense in a meaningful manner. Kaval was restricted to one six-minute phone call per day, and as a result, his family ties deteriorated, causing him great anxiety. Specifically, communication with his daughter became almost nonexistent, which made him feel further isolated and alone.

68. Plaintiff Shymil McBee-Miles was detained at Rikers Island in 2012 as a pretrial detainee. During this detention, McBee-Miles received about three hundred days in Punitive Segregation and served about two hundred and fourteen of those days before he was released from City custody. On or about February 8, 2014, McBee-Miles returned to Rikers Island as a pretrial detainee. He then was sent to Punitive Segregation at RNDC, where a correction officer told him that he owed one hundred and sixty-seven days of Old Time. McBee-Miles served approximately two weeks before being released from City custody. On or about May 23, 2014, he returned to Rikers Island as a pretrial detainee. Immediately upon intake, he was sent to Punitive Segregation at OBCC to serve the remaining days of Old Time. In February and May 2014, McBee-Miles did not receive advance written notice, a hearing, the opportunity to defend

24

himself, the opportunity to establish facts concerning what an appropriate disposition or penalty

should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to

serve Old Time.

69.      McBee-Miles is confined to a small, dirty cell for at least twenty-three hours per

day. He is socially isolated from others, and DOC rarely affords him recreation. The cell often

is infested with cockroaches and the toilet often does not work. He sleeps on a thin mattress with

no pillow. He receives his meals alone in his cell, and he has lost about ten pounds because of

the small, often undercooked portions. He also is denied adequate medical treatment because

medical staff merely stops by his cell to ask questions without performing a medical

examination. McBee-Miles is studying for his Graduate Equivalency Diploma, but he is unable

to attend school and has no access to a teacher. Instead, he is given "in cell study," in which he

receives a homework packet that he is supposed to complete alone in his cell. McBee-Miles is

Muslim and has been denied access to religious services in Punitive Segregation.

70.      Confined to his small cell, McBee-Miles often feels overwhelmed and bored. He

suffers from severe headaches, reduced ability to concentrate, heart palpitations, and dizziness.

He also suffers back pain as a result of the bed, loss of appetite, some loss of memory, and talks

to himself and feels angry while in Punitive Segregation.

71.      McBee-Miles did not receive advance written notice, a hearing, the opportunity to

defend himself, the opportunity to establish facts concerning what an appropriate disposition or

penalty should be, or a written statement by a fact-finder before he was placed in Punitive

Segregation to serve Old Time twice in 2014. These placements without Adequate Process in

Punitive Segregation to serve Old Time were authorized by City policy and practice that

Defendants Ponte, Cranston, Clemons, and Mirabal condoned. McBee-Miles remains in

Punitive Segregation.

72.    Plaintiff Elijah Selman was detained at Rikers Island in February 2013 as a

pretrial detainee. During this detention, while an adolescent at RNDC, Selman incurred over one

thousand and seven hundred days in Punitive Segregation. Selman was released in October 2013

before he had completed his days in Punitive Segregation. On or about July 13, 2014, Selman

returned to City custody as a pretrial detainee. Less than one day after arriving, he was told to

"pack up" because he "owed days" and he was sent to 3 Lower at RNDC, which is a Punitive

Segregation unit for mentally ill adolescents, to serve his remaining Old Time. On July 19,

2014, Selman was moved from this Punitive Segregation detention unit to the RHU at GRVC,

which is a Punitive Segregation unit for mentally ill adults. Selman remains in Punitive

Segregation today.

73.    In Punitive Segregation, Selman is confined to his small cell in isolation,

generally for twenty-four hours per day. He has become depressed and angry in Punitive

Segregation, and his mental health has steadily declined. Until recently, he was offered

recreation only about twice per month. When Selman is offered recreation, he must wear full

restraints while being escorted to and from the barren cage where he is given an hour out of his

cell; the restraints have caused bruising to his wrists. Selman's Punitive Segregation cell is

small, cramped, and dirty; the paint is chipping on the walls. It also has both bugs and mice.

Selman sleeps on a plastic bedframe attached to the wall with a thin mattress, which often causes

him back pain. DOC fails to provide Selman with fresh linens on a regular basis. He is served

meals through a food slot in his steel door and eats alone in his cell. There is barely enough food

and Selman has lost about fifteen pounds due to the poor diet. Selman usually is allowed to

shower only twice per week and has been denied access to basic hygienic items. DOC has failed

to provide him with the opportunity to participate in Catholic religious services. Selman is unable to attend school in any meaningful capacity; instead, a correction officer drops off an "in cell study" packet to his cell.

74.     Selman has been diagnosed with Bipolar Disorder, Behavioral Disorder, and Attention Deficit Hyperactivity Disorder since the age of six or seven, and he has been hospitalized multiple times due to his mental illnesses. While in Punitive Segregation, Selman has been denied regular access to his prescribed medication and meaningful access to mental health services. Selman also suffers from asthma and has not been provided adequate medical services. In the beginning of October 2014, GRVC was placed in a security lockdown for five days. During that time Selman was not provided recreation, showers, mental health or medical treatment, and when DOC staff sprayed riot gas in the unit he suffered from an asthma attack and did not receive medical treatment.

75.     Selman did not receive advance written notice, a hearing, the opportunity to defend himself, the opportunity to establish facts concerning what an appropriate disposition or penalty should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to serve Old Time. This placement without Adequate Process in Punitive Segregation to serve Old Time was authorized by City policy and practice that Defendants Ponte and Clemons condoned.

76.     Jamon Sutton was detained at Rikers Island in 2009 as a pretrial detainee. During this detention, he received a substantial amount of Punitive Segregation days. On or about March 2010, he was released from City custody, before serving all of his Punitive Segregation days. Three years later, in 2013, he was detained twice at Rikers Island, but was not placed in Punitive Segregation to serve Old Time. On or about February 2014, Sutton returned to Rikers

Island as a pretrial detainee. Initially he was placed in general population, but on or about March 2014, he was sent to Punitive Segregation at OBCC to serve Old Time. Sutton served about one hundred and fifteen days in Punitive Segregation for Old Time.

77.    While in Punitive Segregation, Sutton was confined alone in a small cell for twenty-three and in most cases twenty-four hours per day. DOC often denied Sutton access to recreation out of his cell. Sutton's cell was hot, cramped, filthy, and his sink dripped, which caused bugs to accumulate in his cell. He was not provided sufficient food, and on many days, the food was served to him cold and was inedible. Sutton also was denied religious services and meaningful medical care. In June and July 2014, he injured his head but DOC denied him medical care for days. While in Punitive Segregation, Sutton suffered from cramping in his chest. He felt miserable, uncomfortable, and anxious to get out of the cell. Sometimes he felt like the walls were closing in on him and that he was totally isolated and no one could hear him. At times he felt angry and depressed.

78.    ·  Sutton did not receive advance written notice, a hearing, the opportunity to defend himself, the opportunity to establish facts concerning what an appropriate disposition or penalty should be, or a written statement by a fact-finder before he was placed in Punitive Segregation to serve Old Time. This placement without Adequate Process in Punitive Segregation to serve Old Time was authorized by City policy and practice that Defendants Ponte, Cranston, Clemons, and Mirabal condoned.

79.    During their confinement in Punitive Segregation to serve Old Time, Plaintiffs were and have been subjected to onerous and punitive conditions of confinement that are not imposed upon detainees held in general population.

80.    Pursuant to Defendants' policy and practice, in placing Plaintiffs in Punitive

Segregation to serve Old Time, the DOC did not evaluate the reasonableness of Plaintiffs' confinement in Punitive Segregation or the availability of adequate alternatives in light of the detainees' present circumstances and the circumstances of the facility.

81.     Because of their confinement in Punitive Segregation on Old Time, Plaintiffs have suffered mental, emotional, and psychological harm, in addition to loss of liberty.

**E.     Defendants' Knowledge of the Conditions in Punitive Segregation and the Old Time Policy**

82.     For years, Defendants have known or reasonably should have known that solitary confinement, implemented in City facilities as Punitive Segregation, causes serious and permanent harm to inmates and constitutes punishment.  At a recent City Council meeting attended by Defendants Ponte and Clemons, the Deputy Commissioner of the NYC Department of Health and Mental Hygiene ("NYC DOH") explained that "when we actually look at the research, people in punitive seg[regation] do try to kill themselves more than in other places." From 2010 to 2012, NYC DOH collected and analyzed electronic medical records of 244,699 inmate detentions in City facilities.  In a peer-reviewed article published in the American Journal of Public Health, NYC DOH reported that for inmates in City custody, "acts of self-harm were strongly associated with assignment of inmates to solitary confinement."  Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442, 445 (March 2014), *available at* http://ajph.aphapublications.org/doi/pdf/10.2105 /AJPH.2013.301742.  "Inmates punished by solitary confinement were approximately 6.9 times as likely to commit acts of self-harm after we controlled for the length of jail stay, SMI [serious mental illness], age, and race/ethnicity.  This association also held true for potentially fatal self-harm with a slightly lower OR [odds ratio], 6.3."  *Id.*  NYC DOH stated that these empirical findings are "consistent with our clinical observations regarding self-harm."  *Id.* at 446.  As the

Assistant Commissioner of NYC DOH has acknowledged, "it is expected that healthy persons when placed in solitary confinement will suffer harm." NYC Board of Correction, *Minutes for May 13, 2013 Public Meeting*, at 10 (2013), *available at* http://www.nyc.gov/html/boc /downloads/pdf/Minutes/BOCMinutes _20130513.pdf.

83.    In 2013, the NYC Board of Correction commissioned a study by psychiatrists from Yale University and New York University on solitary confinement in New York City facilities. James Gilligan, M.D. & Bandy Lee, M.D., *Report to the New York City Board of Correction*, at 1 (Sept. 2013) ("Gilligan Report"), *available at* http://solitarywatch.com/wp-content/uploads/2013/11/Gilligan-Report.-Final.pdf. The doctors visited City facilities, spoke with correctional and health staff, interviewed inmates, and reviewed extensive documentation from the City. *Id.* at 1-2. They found that: "Prolonged solitary confinement (sensory deprivation and social isolation) can induce psychotic symptoms (such as hallucinations and delusions) and behavioral abnormalities (including suicidality and homicidality) in people who had not previously experienced such symptoms." *Id.* at 8. Further, they found that "the use of punitive segregation even among those not diagnosed as mentally ill is likely to increase the frequency of mental illness in the jail population, together with associated symptoms such as suicidal and assaultive behavior." *Id.* They concluded:

> The use of prolonged solitary confinement can only be seen by both inmates and staff as one of the most severe forms of punishment that can be inflicted on human beings short of killing them; that it can precipitate and/or exacerbate the symptoms of mental illness; that it can provoke suicidal, assaultive and homicidal behavior, self-mutilation, and other pathologic behaviors; and that it has been more or less universally recognized among the civilized nations of the earth as a form of torture and thus a most serious violation of human rights; that it therefore should not be imposed upon any inmates in the jail, whether they have yet shown signs and symptoms of mental illness or not; and that it is not enough merely to liberate an inmate from this form of

30

> torture only after he has already been tortured to the point of experiencing emerging symptoms of psychosis and/or suicidality.

*Id.* at 6. Defendants are aware of the Gilligan Report, and Defendants Ponte, Cranston, Schriro, Clemons, and Mirabal each attended Board of Correction or City Council meetings at which the findings of the Gilligan Report were discussed.

84.    After reviewing the Gilligan Report, a committee of the Board of Correction noted that in recent years, the City's use of Punitive Segregation has greatly increased: "From 2007 through June 30, 2013, the number of punitive segregation beds in the City jail system has grown from 614 to 998, a 61.5% increase." NYC Board of Correction, *Minutes for September 9, 2013 Public Meeting*, at 11 (2013), *available at* http://www.nyc.gov/html/boc/downloads /pdf/Minutes/BOCMinutes_20130909.pdf.  The Board of Correction committee found that "[t]he main rationale for the [61.5%] increased use of punitive segregation [from 2007 to June 30, 2013] has been to maintain safety, but the increase in punitive segregation beds has been matched by an increase in violence and injury." *Id.*  As the Gilligan Report found, "punishment, far from preventing violence, is the most powerful tool we have yet created for stimulating violence." Gilligan Report at 5.  This is consistent with the New York City Council's recent statement, on August 21, 2014, that  Punitive Segregation "can be deleterious to physical and mental health" and that "[a] growing body of academic research has found that solitary confinement can cause severe psychological damage and may in fact increase both violent behavior and suicide among incarcerated individuals." Res. 0379-2014.

85.    Defendants were specifically aware of the policy and practice of placing detainees in Punitive Segregation to serve Old Time and allowed it to continue.  Defendants have received reports and updates concerning the use of Punitive Segregation in City facilities, including the placement of pretrial detainees in Punitive Segregation to serve Old Time.  Although Directive

31

6500R-B is an official policy of DOC, which the Commissioner and Chief of Department have had the authority to modify during their DOC tenures, Defendants have neither modified Directive 6500R-B nor meaningfully changed how it is implemented. Indeed, the Deputy Commissioner of DOC confirmed to the City Council on June 12, 2014 that this policy and practice would continue. Despite a New York City Council resolution adopted on August 21, 2014, urging the City to "end the practice of placing individuals returning to City jails into punitive segregation, also known as solitary confinement, to complete time owed" (Res. 0379-2014), Defendants have followed and continue to follow Directive 6500R-B.

**F.    Alternatives to Punitive Segregation**

86.    Punitive Segregation is only one way to separate inmates from others. In fact, the City currently operates two alternatives to Punitive Segregation. The first alternative is Administrative Housing units ("AHU"), which the City has described as separating an inmate from others, while ensuring that "the conditions of detention are identical to those in effect in the general population." Attachment to NYC Board of Correction, *Minutes for June 3, 2013 Public Meeting* (2013), *available at* http://www.nyc.gov/html/boc/downloads/pdf/Minutes /BOC%20Minutes%2020130603%20with%20handout.pdf. The second alternative is the Clinical Alternative to Punitive Segregation ("CAPS") program, which the City has described as "a secure clinical setting in jail operated [by] DOHMH" for "seriously mentally ill" inmates. *Id.* The City has stated that the "focus [of CAPS] is treatment: DOC will set aside the [Punitive Segregation] penalty that is imposed [and] the length of time spent in this unit will be clinically determined by DOHMH." *Id.* As described by the City, inmates in AHU and CAPS are not in Punitive Segregation.

## CLASS ALLEGATIONS

**A.    Injunctive Class and Subclass**

87.    With respect to their claims for injunctive and declaratory relief, Plaintiffs Bryant, Hickman, McBee-Miles, and Selman bring this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2), on behalf of:

> a.    all persons who are now, or will be in the future, pretrial detainees in the City's custody held in Punitive Segregation to serve Old Time, in violation of the Fourteenth Amendment's substantive due process protections ("Injunctive Class"); and
>
> b.    all Injunctive Class members who did not receive Adequate Process before being held in Punitive Segregation to serve Old Time, in violation of the Fourteenth Amendment's procedural due process protections ("Injunctive Subclass").

**B.    Rule 23(a)**

88.    The Injunctive Class and Injunctive Subclass each are so numerous that joinder of all members is impracticable. Over 550 inmates are in Punitive Segregation in the City's custody, and about 10% of those inmates are pretrial detainees serving Old Time. Nearly all, if not all, of those inmates did not receive Adequate Process before confinement in Punitive Segregation. All Injunctive Class and Injunctive Subclass members are detained in the City's custody, and most are economically disadvantaged, making individual lawsuits impracticable. They are a transitory population, detained temporarily in City facilities awaiting trial, which would make joinder of all such members impracticable. Judicial economy weighs in favor of avoiding multiple actions challenging the same policy and practice, particularly where individual

suits could lead to potentially inconsistent results.

89.     For each class and subclass herein, the members are identifiable using records maintained by the City in the ordinary course of business.

90.     Defendants have promulgated and implemented Directive 6500R-B, which is a specific policy applicable to all class and subclass members herein.  Defendants are aware of and allow to continue a policy and practice in which pretrial detainees are placed and held in Punitive Segregation, without Adequate Process, to serve Old Time when DOC recognizes that the pretrial detainee has Old Time and when Punitive Segregation cells are available.  Defendants have abridged class and subclass members' Fourteenth Amendment right to be free from punitive measures that may not constitutionally be imposed before a determination of guilt. Defendants also have abridged those members' Fourteenth Amendment right to procedural protections before being deprived of liberty.

91.     Common questions of law and fact exist for all class and subclass members herein and predominate over any questions solely affecting individual members thereof.

92.     Among the questions of law and fact common to members of the Injunctive Class are:

      c.    whether Defendants' policy and practice of holding pretrial detainees in Punitive Segregation to serve Old Time violates the Fourteenth Amendment;

      d.    whether confinement of pretrial detainees in Punitive Segregation to serve Old Time is specifically for the purpose of punishment; and

      e.    whether confinement of pretrial detainees in Punitive Segregation to serve Old Time is reasonably related to a legitimate governmental objective.

93.     In addition, the scope of declaratory and injunctive relief to which the Injunctive

34

Class members are entitled is a common question of law and fact.

94.    Among the questions of law and fact common to the Injunctive Subclass are:

f.    whether Defendants' policy and practice of refusing to provide pretrial detainees with Adequate Process before confinement in Punitive Segregation to serve Old Time violates the Fourteenth Amendment;

g.    whether pretrial detainees have a liberty interest in avoiding confinement in Punitive Segregation to serve Old Time; and

h.    what process pretrial detainees are due before confinement in Punitive Segregation.

95.    In addition, the scope of declaratory and injunctive relief to which the Injunctive Subclass members are entitled is a common question of law and fact.

96.    Defendants are expected to raise common defenses to the claims of all class and subclass members herein, including denying that their policies and practices violate the Constitution.

97.    Plaintiffs' claims are typical of those of all class and subclass members herein, as their claims arise from the same policies and practices, and Plaintiffs' claims are based on the same legal theories as those of all class and subclass members herein. The cause of Plaintiffs' injuries is the same as the cause of the injuries suffered by all class and subclass members herein, namely Defendants' policies and practices.

98.    Plaintiffs are capable of fairly and adequately protecting the interests of all class and subclass members herein because Plaintiffs do not have any antagonistic interests thereto. Plaintiffs, as well as all class and subclass members herein, seek to enjoin the unlawful policies and practices of Defendants. Counsel experienced in civil rights litigation, prisoners' rights

35

litigation, complex litigation, and class actions represent Plaintiffs.

C.      **Rule 23(b)**

99.     This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of Injunctive Class and Injunctive Subclass members is numerous and prosecution of separate actions by individuals creates a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants. Moreover, the prosecution of separate actions by individual members of the Injunctive Class and Injunctive Subclass is costly, inefficient, and could result in decisions with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

100.    This action also is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies and practices that form the basis of this complaint are generally applicable to all Injunctive Class and Injunctive Subclass members, thereby making class-wide declaratory and injunctive relief appropriate. Common questions of law and fact predominate within the meaning of Rule 23(b)(2) as set forth above. Class treatment provides a fair and efficient method for the adjudication of the controversy herein described, affecting a large number of persons, joinder of whom is impracticable.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 / Fourteenth Amendment
### (Substantive Due Process)

101.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

102.    By their policies and practices described herein, Defendants have authorized and condoned the confinement of Plaintiffs and Injunctive Class members in Punitive Segregation to

serve Old Time, violating the Due Process Clause of the Fourteenth Amendment.  As a result of these unconstitutional policies and practices, Plaintiffs and Injunctive Class members have suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

103.    By confining Plaintiffs and Injunctive Class members in Punitive Segregation to serve Old Time, Defendants have intended to punish Plaintiffs and Injunctive Class members in violation of their Fourteenth Amendment right to be free from punishment as pretrial detainees.

104.    By confining Plaintiffs and Injunctive Class members in Punitive Segregation to serve Old Time under punishing conditions and isolation that are not reasonably related to any legitimate interest in maintaining order in the facility, Defendants have punished Plaintiffs and Injunctive Class members in violation of their Fourteenth Amendment right to be free from punishment as pretrial detainees.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 / Fourteenth Amendment**
**(Procedural Due Process)**

105.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

106.    By their policies and practices described herein, Defendants have authorized and condoned the confinement of Plaintiffs and Injunctive Subclass members in Punitive Segregation without Adequate Process, violating the Due Process Clause of the Fourteenth Amendment.  As a result of these unconstitutional policies and practices, Plaintiffs and Injunctive Subclass members have suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

37

107.    Plaintiffs and Injunctive Subclass members have a liberty interest in avoiding Punitive Segregation.  This liberty interest arises from both the Due Process Clause of the Fourteenth Amendment, by reason of guarantees implicit in the word "liberty," and from an expectation and interest created by state and city laws or policies, including Title 39, Chapter 1 of the Rules of the City of New York and Directive 6500R-B.

108.    By placing Plaintiffs and Injunctive Subclass members in Punitive Segregation to serve Old Time without regard for the appropriateness of such confinement and without affording Plaintiffs and Injunctive Subclass members Adequate Process, the Defendants violated Plaintiffs' and Injunctive Subclass members' due process rights.

### PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1.    Award compensatory damages in an amount to be determined for all physical, psychological, mental, and emotional injuries, as well as loss of liberty, sustained by Plaintiffs as a result of the policies and practices alleged herein;

2.    Award punitive damages in an amount to be determined at trial;

3.    Award reasonable attorneys' fees, together with the costs of this action; and

4.    Grant such other further relief as the Court may deem appropriate.

WHEREFORE, Plaintiffs Bryant, Hickman, McBee-Miles, and Selman request that the Court grant the following additional relief:

1.    Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2);

2.    Declare that holding pretrial detainees in Punitive Segregation to serve

Old Time violates the Fourteenth Amendment;

      3.    Declare that holding pretrial detainees in Punitive Segregation without Adequate Process violates the Fourteenth Amendment;

      4.    Preliminarily and permanently enjoin Defendants City, Ponte, and Clemons from subjecting pretrial detainees to Punitive Segregation to serve Old Time; and

      5.    Preliminarily and permanently enjoin Defendants City, Ponte, and Clemons from subjecting pretrial detainees to Punitive Segregation without Adequate Process.

Dated:  October 30, 2014
New York, New York

              THE LEGAL AID SOCIETY

              William Gibney
              Marlen S. Bodden
              Barbara P. Hamilton
              199 Water Street
              New York, New York  10038
              (212) 577-3300
              wdgibney@legal-aid.org
              mbodden@legal-aid.org
              bphamilton@legal-aid.org

              *- and -*

              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

              Christopher Terranova
              Rafael L. Guthartz
              Anthony Mozzi
              Julian Radzinschi
              1285 Avenue of the Americas

New York, New York  10019
(212) 373-3000
cterranova@paulweiss.com
rguthartz@paulweiss.com
amozzi@paulweiss.com
jradzinschi@paulweiss.com

*Attorneys for Plaintiffs*